# United States Court of Appeals
# for the Federal Circuit

---

**TAWANA HARRIS,**
*Petitioner*

**v.**

**SECURITIES AND EXCHANGE COMMISSION,**
*Respondent*

---

2019-1676

---

Petition for review of the Merit Systems Protection Board in No. DC-0432-18-0390-I-1.

---

Decided: August 25, 2020

---

DAVID BRANCH, Law Office of David A. Branch, Washington, DC, argued for petitioner.

MOLLIE LENORE FINNAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by ETHAN P. DAVIS, REGINALD THOMAS BLADES, JR., ROBERT EDWARD KIRSCHMAN, JR., ADAM E. LYONS; CHRISTINA ANNE COTTER, Office of the General Counsel, United States Securities and Exchange Commission, Washington, DC.

---

Before NEWMAN, LINN, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

Tawana Harris petitions for review of a decision by the Merit Systems Protection Board upholding her performance-based removal by the Securities and Exchange Commission (SEC). Because substantial evidence supports the Board's factual findings, we affirm.

I

A

From 2014 to 2018, Ms. Harris was the Branch Chief of the Continuity of Operations (COOP) branch, a division of the SEC's Office of Support Operations (OSO) in Washington, D.C. The COOP branch is responsible for ensuring that the SEC can continue performing essential functions in the event of an emergency, such as a natural disaster. In February 2018, Ms. Harris was removed from the agency for "unacceptable performance" of her duties, pursuant to chapter 43 of title 5. *See* 5 U.S.C. § 4303(a) (authorizing federal agencies to "remove an employee for unacceptable performance").

Chapter 43 governs the "Performance Appraisal" of federal agency employees, establishing standards for evaluating work performance and imposing sanctions of removal or demotion for unacceptable performance. 5 U.S.C. §§ 4301–4315; *Lisiecki v. Merit Sys. Prot. Bd.*, 769 F.2d 1558, 1561 (Fed. Cir. 1985). Chapter 43 defines "unacceptable performance" as "performance of an employee which fails to meet established performance standards in one or more critical elements of such employee's position." 5 U.S.C. § 4301(3) (2012). The term "critical element" is also a term of art, referring to a key "work assignment or responsibility" established as part of the written performance standards for each type of position within the agency. *See* 5 C.F.R. § 430.203. Performance standards and critical elements of each employee's position must be

communicated to the employee at the beginning of each appraisal period, 5 U.S.C. § 4302(b)(2) (2012),[1] which generally runs for 12 months, 5 C.F.R. § 430.206(a)(2). Each agency's performance appraisal system must "provide for . . . reassigning, reducing in grade, or removing employees who continue to have unacceptable performance but only after an opportunity to demonstrate acceptable performance." 5 U.S.C. § 4302(b)(6) (2012). Agencies typically provide this opportunity to demonstrate acceptable performance by placing the underperforming employee on a Performance Improvement Plan, or PIP.

B

On October 13, 2016, Ms. Harris received her 2017 Performance Work Plan from her then-supervisor, Kelly Gibbs, covering the period from October 1, 2016, through September 30, 2017. Like the year before, Ms. Harris's 2017 performance work plan included three critical elements, two of which are at issue here: (1) Achieving Results in Occupation and (2) Teamwork and Collaboration. The uniform four-level performance rating scale for each critical element progressed from "Unacceptable," to "Improvement Required," to "Accomplished Practitioner," and up to "Performance Leader."

In December 2016, Ms. Harris's second-line manager and OSO Deputy Director, Olivier Girod, detailed Ms. Harris to work directly under him in a non-supervisory capacity while the agency investigated accusations that one of

---

[1]    On December 12, 2017, this section was amended to insert certain whistleblower protections at subsection (b) and redesignate the former subsection (b) as subsection (c). Pub. L. No. 115-91, § 1097(d)(1), 131 Stat. 1619 (2017); *see* 5 U.S.C. § 4302 (Supp. V 2012). Because these amendments post-date the adverse employment action at issue here, this opinion refers to the earlier codification.

her employees had made against her. In June 2017, after the investigation concluded without disciplinary action, Ms. Harris returned to her Branch Chief duties. Aimée Primeaux then became her direct supervisor, as Ms. Gibbs had since transferred to another branch of the OSO. It was after Ms. Primeaux began supervising Ms. Harris that the performance issues on appeal began to surface.

On October 2, 2017, Ms. Primeaux notified Ms. Harris in writing and in person that she was being placed on a 90-day PIP. The PIP notice stated that Ms. Harris had performed unacceptably over the last three months of the appraisal period in both the Achieving Results in Occupation and Teamwork and Collaboration critical elements. The notice described examples such as disregarding Ms. Primeaux's guidance in revising certain work products; coming to meetings unprepared; and demonstrating inflexibility regarding Ms. Primeaux's communications with the three to four COOP branch employees Ms. Harris supervised—Ms. Primeaux's second-line reports—including telling Ms. Primeaux to copy her on all communications to her staff, and requesting that Ms. Primeaux send documents to her prior to sending them to her staff.

The PIP notice informed Ms. Harris that she would have 90 days to improve her performance in both critical elements at issue to at least the Improvement Required level. To do so, she would need to satisfy fifteen Performance Improvement Requirements. Among the ten requirements for improved performance in the Achieving Results in Occupation critical element were: (1) on no more than two occasions during the PIP could she "fail to follow the instructions of management or to effectively incorporate management feedback into [her] work product," and (2) on no more than two occasions could she "fail to demonstrate technical proficiency and expertise on COOP-related matters." J.A. 178. Of the five requirements for improved performance in the Teamwork and Collaboration critical element, the most relevant here is that on no more than two

occasions could she "fail to appropriately engage and collaborate with" team members on COOP-related matters. J.A. 179. The PIP notice advised Ms. Harris that Ms. Primeaux would monitor her performance and provide guidance and feedback, and that they would meet weekly to review Ms. Harris's progress. *Id.*

During the PIP period, the following events transpired which would later form the basis of Ms. Harris's removal. On October 5, 2017, in response to Ms. Harris's previous requests for increased COOP branch staffing, Ms. Primeaux asked Ms. Harris to prepare a draft report of the COOP branch's core projects and the estimated time required to complete them ("the COOP Resource Analysis Project"). Ms. Primeaux set a two-week deadline to receive a draft of the report. But Ms. Harris asked for an extension, explaining that in 2012 and 2013, the OSO had hired a consultant firm to conduct a COOP work force analysis, and it had taken four consultants a combined 2,400 hours to complete the project. Ms. Primeaux denied an extension, explaining that she "simply want[ed] to know what the core work of the program is, and an approximation of how many hours it takes to do that work." J.A. 211.

Ms. Harris submitted a draft report in the form of a Microsoft Excel spreadsheet, which listed time estimates for COOP tasks in text format rather than numerically (e.g., "240 hours," or "80 hours") and contained addition errors. Ms. Primeaux reviewed the draft with Ms. Harris, pointed out the deficiencies, and suggested using Excel formulas to ensure accuracy. Over the following weeks, Ms. Harris provided several revised versions of the spreadsheet, all of which were missing time estimates for various tasks and contained incorrect total estimates. When Ms. Harris complained that she lacked sufficient time and training to prepare the report, Ms. Primeaux responded that she would support Ms. Harris pursuing advanced Excel training although it was not required for this

HARRIS v. SEC

assignment. Ms. Primeaux ended up fixing the spreadsheet for Ms. Harris by removing the word "hours" from each of the time estimate cells and inserting summation and division formulas  She also suggested a basic Excel class that Ms. Harris could take.

When Ms. Primeaux still had not received a complete and accurate report by November 2, she decided to shift their focus to preparing a written executive summary of Ms. Harris's findings from the analysis. On November 9, Ms. Harris sent Ms. Primeaux an email with her executive summary pasted directly into the body of the email and largely focused on the need for more time and resources to complete a workforce analysis like the consultants completed in 2013. Ms. Primeaux found the summary unprofessionally formatted, inadequate in scope, and lacking meaningful action items.

Around the same time, managers across the OSO were preparing 2017 performance evaluations for their direct reports. On October 23, 2017, Ms. Harris met with Mr. Girod, Ms. Primeaux, and Vicki Clancy—who had temporarily supervised the COOP branch while Ms. Harris was on detail—to "calibrate" the performance ratings for the COOP branch staff. During the three-hour meeting, the group discussed the appropriate ratings for Ms. Harris's three employees: Robert Achoe, Vincent Holland, and Leroy Woodall. They discussed giving Mr. Holland a rating of "Improvement Required" for one of his critical elements. Ms. Harris raised concerns about how Mr. Holland might react to receiving such a low rating. Given that he was sometimes "[v]ery angry, hostile," and "unpredictable," Ms. Harris expressed hesitancy about communicating a poor performance review to him one-on-one. J.A. 274–75, 284, 288; *see* J.A. 286. Ms. Clancy agreed that she also would not be comfortable issuing that rating to him alone, and so the two of them should jointly deliver Mr. Holland's assessment.

Based on these behavioral concerns, Mr. Girod contacted human resources officials and the Office of General Counsel. At their advice, Mr. Girod asked OSO Assistant Director David Brown to look further into Mr. Holland's behavior. He introduced Mr. Brown to Ms. Harris, asking her to "work with [Mr. Brown] in providing any requested information so that we can handle this matter appropriately." J.A. 282. Ms. Harris and Mr. Brown met for two hours on November 15. Mr. Brown relayed his detailed notes of the meeting to Mr. Girod, reporting that Ms. Harris had been "defensive and reticent" and inexplicably uncooperative with his inquiry. J.A. 288. Ms. Harris also never responded to his request for certain documents that she had offered to provide relating to Mr. Holland's behavior.

Meanwhile, final employee performance ratings and narratives were to be uploaded to the evaluations system by November 13. On November 6, Ms. Primeaux emailed Ms. Harris and Ms. Clancy to confirm that they would be "co-planners" for the three COOP branch employees that they had both supervised at different times during the 2017 cycle. J.A. 302. Ms. Harris was responsible for submitting Mr. Achoe's and Mr. Holland's calibrated ratings, incorporating Ms. Clancy's feedback for the months when she supervised them. On November 13, Ms. Harris uploaded ratings and narratives for each of them, but (1) they covered only a fraction of the year, (2) she rated Mr. Holland as an Accomplished Practitioner for both of his critical elements, and (3) she did not include any comments from Ms. Clancy. On December 6, 2017, after several weeks of re-submitting noncompliant evaluations, Ms. Harris finalized her staff appraisals.

On January 8, 2018, after the PIP period ended, Ms. Primeaux issued Ms. Harris a notice of proposed removal. The proposed removal charged Ms. Harris with eight instances of failing to meet the Performance Improvement Requirements set for the Achieving Results in

Occupation critical element and three instances of failing to meet those set for the Teamwork and Collaboration critical element. First, the proposed removal charged Ms. Harris with failing to follow management instructions and incorporate management feedback on four occasions:

1. By failing to respond to Mr. Brown's request for additional documentation after their meeting about Mr. Holland's behavior, despite Mr. Girod asking her to cooperate;

2. By sending Ms. Primeaux a revised Excel spreadsheet for the COOP Resource Analysis Project that did not contain formulas, despite Ms. Primeaux recommending formulas and providing resources for assistance;

3. By uploading incomplete staff performance narratives on November 13, 2017 and not collaborating with Ms. Clancy to incorporate her feedback for them; and

4. By providing an updated performance narrative for Mr. Holland on November 21, 2017 that still omitted Ms. Clancy's feedback and did not cover the entire performance cycle.

J.A. 168. The proposed removal further charged Ms. Harris with failing to demonstrate technical proficiency and expertise on COOP-related matters on four occasions during her attempts to revise the spreadsheet for the COOP Resource Analysis Project and in preparing a low-quality executive summary of the project. J.A. 168–69. Finally, the proposed removal charged Ms. Harris with failing to cooperate with and meaningfully support OSO management initiatives on three occasions:

1. By failing to convey Mr. Holland's performance deficiencies by refusing to give him the formerly agreed-upon Improvement Required rating for the Achieving Results in Occupation critical

element—instead rating him an Accomplished Practitioner;

2. By not cooperating with Mr. Brown to help address employee misconduct; and

3. By repeatedly pushing for more time and training to complete the COOP Resource Analysis Project, despite Ms. Primeaux consistently communicating that she was looking for approximations, not a complex report.

J.A. 170–71.

In late January, Ms. Harris (with assistance of counsel) provided an oral response to the proposed removal. On February 21, 2018, Mr. Girod issued a final removal decision, removing Ms. Harris from her position effective immediately.

C

Ms. Harris appealed her removal to the MSPB, arguing that the agency had not proven the merits of its removal action, and that her removal was motivated by race discrimination and retaliation for her various prior Equal Employment Opportunity (EEO) complaints against SEC management. As will be discussed further, this combination of arguments made her appeal to the MSPB a "mixed case" because she challenged her removal as being, at least in part, due to unlawful bias. *See Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct. 1975, 1979 (2017). Besides challenging the sufficiency of the evidence supporting her removal under chapter 43, Ms. Harris presented two affirmative defenses—race discrimination and retaliation—based on (1) receiving positive reviews and recognition before her first EEO complaint in 2016; (2) being placed on the PIP after only three months under Ms. Primeaux's supervision; (3) facing subjective and unattainable performance requirements under the PIP; and (4) enduring Ms. Prime-

aux's shifting criteria for the various PIP tasks. J.A. 676–78.

At a hearing on July 24, 2018, the Administrative Judge heard testimony from six witnesses, including Ms. Harris, Ms. Primeaux, Mr. Girod, and Mr. Brown.[2] The Administrative Judge then issued a detailed decision upholding Ms. Harris's removal, finding that substantial evidence supported the agency's action, and that Ms. Harris had not proved her removal was the product of discrimination or retaliation. *Harris v. Sec. & Exch. Comm'n*, No. DC-0432-18-0390-I-1, 2018 WL 6682317, slip op. at 22 (M.S.P.B. Dec. 13, 2018) (*Board Decision*); *see* 5 U.S.C. § 7701(c)(1)(A), (2)(B).

The Administrative Judge's initial decision became the final decision of the Board on January 17, 2019. *See* 5 U.S.C. § 7701(e)(1). Ms. Harris timely petitioned for review. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

II

Under our narrow standard of review, we will set aside a final decision of the Board only if the decision is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures

---

[2]    Although Ms. Harris provided neither a written transcript nor an audio recording of the administrative hearing, we have obtained from the MSPB a copy of the full administrative record—including the audio recordings of the hearing. We decline the government's suggestion to disregard all of Ms. Harris's arguments supported only by citation to the audio recording. *See Kinslow v. Dep't of the Treasury*, 315 F. App'x 286, 288 (Fed. Cir. 2009) (unpublished per curiam) (accepting audio recording of administrative hearing as a substitute for a written transcript). Nonetheless, we strongly urge litigants to provide written hearing transcripts whenever possible.

required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). "This court's role is further circumscribed when reviewing a performance-based action taken under [c]hapter 43" because of the deference owed to each agency's judgment regarding its employees' performance "'in light of the agency's assessment of its own personnel needs and standards.'" *Martin v. F.A.A.*, 795 F.2d 995, 997 (Fed. Cir. 1986) (quoting *Lisiecki*, 769 F.2d at 1562 (in turn quoting S. REP. NO. 95-969, at 45 (1978))).

Federal agencies that wish to remove an employee for poor performance have two procedural routes available to them: one under chapter 43, and another under chapter 75.[3] *See Sayers v. Dep't of Veterans Affs.*, 954 F.3d 1370, 1378–79 (Fed. Cir. 2020) (explaining differences between chapter 43 and chapter 75 adverse actions); *Lisiecki*, 769 F.2d at 1566 (same). Removal or demotion by an agency under chapter 43 is "subject to a more limited review" by the Board than actions under chapter 75. *Eibel v. Dep't of the Navy*, 857 F.2d 1439, 1444 (Fed. Cir. 1988); *compare* 5 U.S.C. § 7701(c)(1)(A) (agency decision based on chapter 43 sustained if supported by substantial evidence), *with id.* § 7701(c)(1)(B) (agency decision in any other case sustained if supported by a preponderance of the evidence).

---

[3]    These options are not mutually exclusive. *See Lovshin v. Dep't of the Navy*, 767 F.2d 826, 843 (Fed. Cir. 1985) (en banc) (noting that an agency might charge an employee under "Chapter 43 for 'unacceptable performance' in a critical element with an alternative, or additional charge, under Chapter 75 for 'such cause as will promote the efficiency of the service'" (first quoting 5 U.S.C. § 4303(a); and then quoting 5 U.S.C. § 7513(a))). Although chapter 75 is typically invoked for misconduct-based actions, it also authorizes performance-based actions. *Id.*

In order to properly remove or demote an employee under chapter 43, the agency must have (1) established a performance appraisal system approved by the Office of Personnel Management, (2) communicated objective and reasonable written performance standards and critical elements of an employee's position to her at the beginning of the appraisal period, (3) warned her of inadequacies in critical elements during the appraisal period, and (4) counseled and afforded her an opportunity for improvement after proper notice. *Lovshin v. Dep't of the Navy*, 767 F.2d 826, 834 (Fed. Cir. 1985) (en banc); *Martin*, 795 F.2d at 997. "If those requirements have been satisfied, an agency may reduce in grade or remove an employee for receiving a rating of 'unacceptable' *with respect to even a single* critical element." *Martin*, 795 F.2d at 997 (emphasis in original) (citation and internal quotation marks omitted).

Ms. Harris's arguments primarily involve the third and fourth elements as she asserts that she received neither adequate warning of her performance issues nor a meaningful opportunity to improve.[4]

---

[4]    In a single paragraph of her opening brief, and without citing any legal authority, Ms. Harris also argues that she was deprived of due process because Mr. Girod—who was named as the responsible management official in Ms. Harris's prior EEO complaints—was not a neutral final decisionmaker. Pet. Br. 37. We decline to reach this due process argument, as it is both undeveloped on appeal and was waived before the administrative hearing. *Board Decision* at 4 n.5; J.A. 676; Order and Summary of Telephonic Prehearing Conference, *Harris v. Sec. & Exch. Comm'n*, No. DC-0432-18-0390-I-1, MSPB File, Tab 13, at 2; *see Ladd v. United States*, 713 F.3d 648, 655 (Fed. Cir. 2013); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).

A

To satisfy the third element required for disciplinary action under chapter 43, the agency must have "warned [the employee] of inadequacies in critical elements during the appraisal period." *Lovshin*, 767 F.2d at 834 (internal quotation marks omitted). Ms. Harris argues that Ms. Primeaux did not sufficiently warn her that her performance was critically deficient before placing her on the PIP, and intimates that the Administrative Judge erred by "treat[ing] the PIP itself as the instance of warning of unacceptable performance."[5]  Pet. Br. 26, 28–29.  But, as Ms. Harris conceded at oral argument, there is no rule or regulation requiring an agency acting under chapter 43 to notify or warn an underperforming employee of a performance problem before issuing a PIP.  *See* Oral Arg. at 26:03–37, 27:14–20, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2019-1676.MP3.  Indeed, the PIP notice itself often serves as the warning.  *See* J.A. 176–77 (listing examples of unacceptable performance); *Greer v. Dep't of the Army*, 79 M.S.P.R. 477, 481 (Aug. 28, 1998) (noting that "the PIP notice itself unmistakably informed" the appellant that his performance in a critical element was not satisfactory).

Ms. Harris objects, however, that because her PIP notice was issued on October 2, 2017—*after* the 2017 appraisal period ended on September 30—she was not warned "during the appraisal period," as *Lovshin* purportedly requires.  767 F.2d at 834; Pet. Br. 28.  This argument misreads *Lovshin*.  There, we said that an agency may take action under chapter 43 if it has, among other things,

---

[5]    Although Ms. Harris intersperses these assertions within her argument that she lacked a meaningful opportunity to improve, we believe it prudent to address them separately before next addressing her arguments related to the fourth element.

"communicated the written performance standards and 'critical elements' of an employee's position to the employee at the beginning of the appraisal period, [and] has warned of inadequacies in 'critical elements' during the appraisal period." *Lovshin*, 767 F.2d at 834. Reading these two conditions together makes clear that *Lovshin* does not require that the warning come at any particular time, but rather requires that the warning relate to inadequacies that occurred during the same appraisal period for which the written performance standards were communicated. We agree with the government that the goal of these twin requirements—communicated standards and a related deficiency warning—"prevent the agency from starting a PIP for failures in one period that are only failures when judged against standards from another period." Resp. Br. 37–38. The applicable chapter 43 regulation confirms this reading: "At any time during the performance appraisal cycle that an employee's performance is determined to be unacceptable in one or more critical elements, the agency shall notify the employee . . . ." 5 C.F.R. § 432.104. The regulation focuses only on the time when the inadequacies occurred, placing no condition on when the notification or warning occurs.

Ms. Harris's PIP notice warned her of numerous inadequacies occurring in the last two months of the 2017 appraisal period, as judged against the 2017 written performance standards which she acknowledged receiving at the beginning of that period. *E.g.*, J.A. 176 (listing failures to perform certain duties within a critical element "at a minimally acceptable level during the 2017 rating period"); *see* J.A. 361 (signed 2017 Performance Work Plan). Substantial evidence thus supports the Administrative Judge's determination that Ms. Harris was sufficiently warned of her inadequate performance.

B

As to the fourth element, requiring a reasonable opportunity to improve, Ms. Harris contends that her PIP standards were unreasonable and that the Administrative Judge erred by ignoring evidence of agency actions before and during the PIP showing that her termination was predetermined.

1

Before reaching the substance of these arguments, we must address the government's jurisdiction-related objection to Ms. Harris continuing to argue in this court that her PIP placement was pretextual and that her removal was predetermined. The government contends that if we entertain these continued pretext arguments then this appeal remains a "mixed case" over which we lack jurisdiction.

A mixed case is one in which a federal employee (1) complains of having suffered a serious adverse personnel action appealable to the MSPB and (2) attributes the adverse action, in whole or in part, to bias prohibited by federal antidiscrimination laws. *Perry*, 137 S. Ct. at 1979; *Williams v. Dep't of the Army*, 715 F.2d 1485, 1487 (Fed. Cir. 1983) (en banc); *see* 5 U.S.C. § 7702(a)(1); 29 C.F.R. § 1614.302(a); 5 C.F.R. § 1201.151. It is undisputed that Ms. Harris presented a mixed case to the Board when she appealed her performance-based removal, asserting twin affirmative defenses that her removal was due to race discrimination and prohibited retaliation, *see Williams*, 715 F.2d at 1487 (discrimination claims before the MSPB appear as "allegation[s] in the nature of an affirmative defense").

But whereas the Board has jurisdiction to hear appeals of mixed cases, we do not. *Compare* 5 U.S.C. § 7702(a)(1) (granting the MSPB jurisdiction to "decide both the issue of discrimination and the appealable action"), *with id.* § 7703(b)(1)(B) (granting the Federal Circuit jurisdiction

over a "final decision of the Board that raises *no challenge* to the Board's disposition of allegations of a prohibited personnel practice" covered by federal antidiscrimination law, among others) (emphasis added)); *see Perry*, 137 S. Ct. at 1988 ("[I]n mixed cases . . . in which the employee (or former employee) complains of serious adverse action prompted, in whole or in part, by the employing agency's violation of federal antidiscrimination laws, the district court is the proper forum for judicial review.").

Still, a petitioner's explicit waiver of her discrimination claims in such a case effectively converts the case to a standard appeal of the adverse personnel action—providing this court with jurisdiction to review the Board's decision (without considering any discrimination claims). *See Diggs v. Dep't of Hous. & Urban Dev.*, 670 F.3d 1353, 1355 n.2 (Fed. Cir. 2011) (noting that in a mixed case, "we have jurisdiction over the adverse action claim if 'any claim of discrimination . . . raised before the Board has been abandoned and will not be raised or continued in this or any other court'" (quoting Fed. Cir. R. 15(c) (June 2011)) (omission in original). Ms. Harris availed herself of that option here. After filing her petition for review in this court, she submitted a Form 10 Statement Concerning Discrimination averring that "[a]ny claim of discrimination . . . raised before and decided by the Merit Systems Protection Board or arbitrator has been abandoned or will not be raised or continued in this or any other court." Dkt. No. 13.

According to the government, having thus formally waived her discrimination and retaliation claims, Ms. Harris cannot now assert *any* arguments that the PIP was pretextual or that her termination was predetermined without returning this appeal to mixed case status. That is not so. In challenging the MSPB's final decision in this court, Ms. Harris is as free as any other litigant to press any argument not based on claims of prohibited discrimination or retaliation. And the pretext and predetermination arguments contained in her briefs here do not rest on the

discrimination and retaliation claims she presented to the MSPB.[6]  She does not suggest, for instance, that any racial animus or illegal retaliation motivated her PIP placement and eventual removal.  She simply argues that the reasons given for placing her on the PIP, and the poor assessment of her performance during the PIP, were insincere and contradicted by record evidence.

The government also suggested at oral argument that Ms. Harris's ongoing district court case against the SEC belies her Form 10 waiver of discrimination claims filed in this court.  Oral Arg. at 12:49–14:40, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2019-1676.MP3; *see Harris v. Clayton*, No. 18-cv-1840 (D.D.C. filed Aug. 6, 2018).  Ms. Harris's district court complaint alleges violations of federal antidiscrimination laws arising from a variety of allegedly adverse actions by SEC management preceding her termination, some of which are also mentioned in her briefing here.  Complaint ¶¶ 31, 37, 42, *Harris v. Clayton*, No. 18-cv-1840 (D.D.C. Aug. 6, 2018); *see L.A. Biomedical Rsch. Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*, 849 F.3d 1049, 1062 n.6 (Fed. Cir. 2017) ("We can properly take judicial notice of the records of related court proceedings.").  The complaint does not in any way challenge her removal itself—the only adverse personnel action appealed to the MSPB, and the only personnel action we now review.  Contrary to the government's representation at oral argument, Ms. Harris's district court

---

[6]    As we mention below, *infra* note 7, the fact that Ms. Harris cabined her pretext and predetermination arguments within her discrimination and retaliation affirmative defenses before the Board may be a reason to conclude that she has not preserved any assertions of pretext or predetermination unconnected with her discrimination and retaliation claims.  But it is not a reason to view this petition as a mixed case.

complaint does not seek "reinstatement" as relief; it seeks damages for allegedly discriminatory conduct that transpired before her removal.    Complaint at 11, *Harris*, No. 18-cv-1840.  By seeking damages for the agency's other purported adverse employment actions, Ms. Harris has not impermissibly bifurcated review of the MSPB's decision regarding her removal.  *See Williams*, 715 F.2d at 1488–90.  Indeed, Ms. Harris filed her district court complaint before the Administrative Judge had even rendered his initial decision in this case.  What impact, if any, Ms. Harris's Form 10 waiver might have on her district court claims is a question best left to the district court.  The existence of that concurrent action does not diminish our authority to review the present case, which no longer involves any claims of discrimination.

As both parties urge, we will hold Ms. Harris to her formal waiver of any discrimination or retaliation claims decided by the MSPB, *see* Dkt. No. 13 (Form 10), and thus retain jurisdiction over this appeal, including Ms. Harris's non-discrimination/retaliation-based pretext arguments. *See Higgins v. Dep't of Veterans Affs.*, 955 F.3d 1347, 1353 (Fed. Cir. 2020) (finding appellate jurisdiction where petitioner filed amended Form 10 abandoning all discrimination claims).

2

Moving to the merits, Ms. Harris advances several theories as to why the Administrative Judge should have found that she was not afforded the meaningful opportunity to improve required by chapter 43.  *See* 5 U.S.C. § 4302(b)(6) (2012) (requiring agencies' performance appraisal systems to provide for demotions or removal of employees "who continue to have unacceptable performance but only after an opportunity to demonstrate acceptable performance"); 5 C.F.R. § 432.104 ("For each critical element in which the employee's performance is unacceptable, the agency shall afford the employee a reasonable

opportunity to demonstrate acceptable performance, commensurate with the duties and responsibilities of the employee's position."); *Martin*, 795 F.2d at 997; *Lovshin*, 767 F.2d at 834. But none of Ms. Harris's theories demonstrate a lack of substantial evidence supporting the Board's decision.

We begin with the simplest: that the PIP standards were not reasonable. Ms. Harris briefly argues that the PIP's fifteen Performance Improvement Requirements were overly broad, but she substantively challenges only the timing and other parameters Ms. Primeaux placed on the COOP Resource Analysis Project. Ms. Harris argues that the Administrative Judge failed to address the substantial evidence that Ms. Primeaux set an unattainable deadline to complete the project in nine days when the consulting firm took 2,400 work hours to complete its "similar project" in 2013, and that she unreasonably insisted that Ms. Harris use Excel formulas to calculate staffing needs. Pet. Br. 30–32.

The first case Ms. Harris cites in support of her arguments is both non-precedential and inapposite. *See Talbot v. Dep't of Health & Human Servs.*, 878 F.2d 1446, 1989 WL 54703 (Fed. Cir. 1989) (unpublished table op.). *Talbot* involved an agency establishing "unattainable timeframes" for its general performance evaluation standards in violation of 5 U.S.C. § 4302(b)(1) (1982) (requiring each agency's performance appraisal system to provide for performance standards that "permit the accurate evaluation of job performance on the basis of objective criteria") (currently codified at § 4302(c)(1)). 1989 WL 54703, at *1. It says nothing about assessing the reasonableness of individual tasks or projects assigned during a PIP.

Even assuming such assessment is appropriate, substantial evidence supports the Administrative Judge's rejection of Ms. Harris's testimony that she lacked sufficient time, resources, and training to complete the COOP

Resource Analysis Project. *See Board Decision* at 13. Ms. Harris was given two weeks to complete just a draft of the resource analysis, and Ms. Primeaux clarified that she was simply looking for an approximation of the hours required to fulfill the COOP branch's core work. J.A. 211. There is no support beyond Ms. Harris's own testimony for her contention that she was being asked to replicate the level of analysis previously completed by hired consultants. The Administrative Judge acknowledged this testimony but found it "plainly refuted" by other record evidence including the examples just described. *Board Decision* at 13; *see Bieber v. Dep't of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal."). As we have said in reviewing the findings of other administrative tribunals, "the presence of evidence supporting the opposite outcome does not preclude substantial evidence from supporting the Board's fact finding." *Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1329 (Fed. Cir. 2019).

We find equally unavailing Ms. Harris's reliance on *Adamsen v. Department of Agriculture* for the proposition that we should scrutinize Ms. Primeaux's instruction to use Excel formulas to calculate staff hours. 563 F.3d 1326 (Fed. Cir. 2009), *opinion modified on reh'g*, 571 F.3d 1363 (Fed. Cir. 2009). In *Adamsen* we stated without deciding that "[o]ne might question" whether it was valid to remove a longtime employee solely for "the failure to use a particular computer model in doing research." 563 F.3d at 1333. Still, because Mr. Adamsen's original performance plan required use of that computer model, we rejected his argument that he was not given an opportunity to show improvement. *Id.* Whatever the import of our hypothetical questioning in *Adamsen*, Ms. Harris's case is quite distinct. She was not removed for failing to use Excel, and certainly not removed solely for not incorporating formulas in the spreadsheet. Both Ms. Harris's failure to incorporate

simple formulas provided by Ms. Primeaux and her failure
to otherwise produce accurate calculations are relevant to
the agency finding that Ms. Harris failed to follow manage-
ment instructions and did not demonstrate technical profi-
ciency as required by the PIP notice.    J.A. 168–71.
Ms. Harris has not shown that her PIP standards were un-
reasonable.

Next, Ms. Harris argues that she was not given a
meaningful opportunity to improve because agency actions
both before and during the PIP showed that her removal
was predetermined.[7]  Beginning with the pre-PIP agency
actions, Ms. Harris asserts that the justifications for plac-
ing her on the PIP were "manufactured," alleging a pattern
of targeting, specifically evidenced by (1) the PIP justifica-
tion related to Ms. Primeaux's direct communications with
Ms. Harris's staff that did not align with her Leading Peo-
ple critical element; (2) Ms. Primeaux misrepresenting the
problems with her work product revision as another reason
for the PIP; and (3) Mr. Girod suddenly deciding to detail
her to a non-supervisory position without verifying the
complaint lodged against her.  Pet. Br. 27–28.  She urges
that the Administrative Judge erred by omitting these
facts from his analysis.  *Id.* at 26, 29.

Initially, just because the Administrative Judge did not
discuss all of these pre-PIP events does not mean he did not
consider them in reaching his decision—and the decision
does in fact describe Ms. Harris being temporarily detailed
to a new assignment by Mr. Girod, *see Board Decision* at 2.
The evidence supporting these arguments consists almost
entirely of Ms. Harris's testimony.  The Administrative

---

[7]    To the extent these arguments were not raised be-
fore the Board, they are waived.  We exercise our discretion
to reach them, nonetheless, as they essentially contest
whether substantial evidence supports the agency's re-
moval action, an issue that was squarely before the Board.

Judge noted the lack of evidentiary support for Ms. Harris's hearing testimony that agency officials conspired to place her on an "impossible" PIP in order to "get rid of her." *Board Decision* at 20. He found Ms. Harris "was not a credible witness," describing her as "evasive and insincere," and unable to provide details to support her accusations of management misconduct. *Id.* at 20 n.26. By contrast, the Administrative Judge repeatedly found Ms. Primeaux's and Mr. Girod's testimony credible. *Id.* at 8 n.11, 15, 18, 21–22. Based on their testimony and supporting documents in the record, he rejected Ms. Harris's assertions of pretext. *Id.* at 21. We must decline Ms. Harris's request that we reweigh her testimony, already definitively rejected as incredible, to overcome the substantial evidence supporting the agency's decision to place her on a PIP. *See Bieber*, 287 F.3d at 1364 (noting that it is not the function of an appellate court to "re-weigh conflicting evidence").

Finally, as for the agency's actions during her PIP, Ms. Harris raises the following arguments to show she was denied a meaningful opportunity to improve: (1) Ms. Primeaux's stated reason for requesting the COOP Resource Analysis Project—to justify adding staff—was belied by her recent reassignment of two staffers away from the COOP branch; (2) Ms. Primeaux's criticism of Ms. Harris's executive summary was pretextual because she had previously submitted a "similar executive summary" to Ms. Primeaux and received no negative feedback; (3) she did not fail to follow directions by changing an established calibration rating decision for Mr. Holland, since Mr. Girod's notes reflect only a tentative rating decision; (4) Mr. Brown's interview with her, purportedly to investigate Mr. Holland's behavior, was simply another opportunity to "provide paperwork support for [her] predetermined termination"; and (5) she did collaborate with Ms. Clancy to submit her staff's performance review narratives but was obstructed by the faulty co-planner function in the review system.

Again, all of these arguments are largely based on Ms. Harris's subjective views of the situation, which the Administrative Judge reasonably rejected for the reasons just discussed for the pre-PIP events. And the documentary evidence Ms. Harris cites in addition is insufficient to show that the Administrative Judge's findings lacked support.

First, Ms. Harris points to Mr. Girod's handwritten notes from the October 23, 2017, COOP branch staff performance rating calibration meeting. The notes regarding Mr. Holland's evaluation begin with the heading "Calibration of Vince; as of now" and reflect an Improvement Required level for the Achieving Results in Occupation critical element. J.A. 274. Ms. Harris insists that these notes are irreconcilable with Ms. Primeaux's and Mr. Girod's testimony (also reflected in the proposed notice of removal) that the group agreed to give Mr. Holland that rating—and show that her managers misrepresented the calibration meeting. But the "as of now" notation does not carry the weight Ms. Harris ascribes to it. Of course, one might reasonably conclude, as Ms. Harris does, that the phrase signifies lack of solid agreement. And the record contains emails from Ms. Harris one week after the calibration meeting saying that, at the meeting, she had disagreed with giving Mr. Holland a low performance rating. *See, e.g.*, J.A. 284. But the record also contains reply emails from Ms. Primeaux stating that Ms. Harris did not disagree with giving Mr. Holland an Improvement Required rating and stating in clear terms that "he is deserving of the lower rating." J.A. 286. These emails, combined with Ms. Primeaux's and Mr. Girod's consistent testimony, provide ample support for the Administrative Judge to find that Ms. Harris failed to support OSO management initiatives by refusing to convey Mr. Holland's performance deficiencies as originally agreed, and later directed. *See Board Decision* at 15–16.

Second, there also exists documentary evidence supporting aspects of Ms. Harris's version of why her staff appraisals did not include Ms. Clancy's feedback. Various emails indicate that the review system's "co-planner feature" was not working and Ms. Harris was confused about how to combine Ms. Clancy's feedback with her own. *See, e.g.*, J.A. 313, 324. But, again, the existence of some evidence supporting Ms. Harris's position does not demonstrate a lack of evidence supporting the Administrative Judge's contrary conclusions. Rather, the record otherwise supports almost entirely the agency's position that Ms. Harris repeatedly avoided and delayed following Ms. Primeaux's increasingly clear explanations of how the combined appraisals were to be submitted. *See, e.g.*, J.A. 310, 324, 326, 328. In sum, none of the agency's actions during the PIP amount to sufficient evidence of pretext to call into question the Administrative Judge's well-supported conclusion that Ms. Harris received a meaningful opportunity to improve her performance.

## III

We have considered Ms. Harris's remaining arguments and find them unpersuasive. The record supports the Administrative Judge's determination that the agency substantiated its chapter 43 removal, despite Ms. Harris's claims of pretext. We therefore affirm the Board's decision.

**AFFIRMED**